NOT RECOMMENDED FOR PUBLICATION
File Name: 20a0307n.06

Case No. 19-1759

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

FILED
May 29, 2020
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE EASTERN DISTRICT OF |
| TOMMY LEE JONES, | ) | MICHIGAN |
| | ) | |
| Defendant-Appellant. | ) | **OPINION** |
| | ) | |

BEFORE: SILER, MOORE, and NALBANDIAN, Circuit Judges.

NALBANDIAN, Circuit Judge. Child pornography extensively hurts the child victims depicted. It creates a permanent record of the child's abuse that repeatedly harms the child each time someone trades in those images. The modern realities of the internet exacerbate those harms by exponentially increasing how easily others may access and trade those images. Congress acknowledges this, put in place harsh penalties for those trafficking in child pornography, and in fact requires district courts to impose restitution orders for those who violate particular child pornography offenses. The sentencing guidelines also recognize the severity of these crimes and provide sentencing enhancements specifically for those convicted of child pornography crimes.

After his conviction for child pornography offenses, Tommy Lee Jones now finds himself in the crosshairs of Congress's enactments and the sentencing guidelines. On appeal, he urges us to find the district court erred when it enhanced Jones's sentence and when it imposed on him a restitution order for his offenses. But we cannot find in Jones's favor. So we AFFIRM.

**I.**

In late 2015, FBI Agent Raymond Nichols investigated those using Ares—an internet-based, peer-to-peer file-sharing program—to share child pornography. *United States v. Jones*, 747 F. App'x 348, 350 (6th Cir. 2018). He found several files "shared by a single computer" with identifying information "known to be associated with child pornography." *Id.* The FBI traced the files to an IP address belonging to Tommy Lee Jones. They then learned that Jones pleaded guilty in 1991 "to attempt[ing] to engage in sexual conduct with" his sister (E.J.) "who at the time was under 13 years of age." (A.R. 8-1, PSR, PageID 9 (labeling this a conviction for "Gross Sexual Imposition").) So the FBI executed a search warrant for Jones's home. *Jones*, 747 F. App'x at 351.

At Jones's home, the FBI found various files of child pornography (including files Agent Nichols had identified during his online investigation) on a laptop and placed in a "'share' folder on the laptop's desktop[.]" *Id.* Those files included child pornography videos depicting a particular victim named "Vicky[.]" *Id.* at 352. An examination of the laptop revealed that "the Ares program was set up so that other Ares users could download files from the 'share' folder, but they could not add things to the folder or access other parts of the laptop's hard drive." *Id.* at 351.

Agent Nichols and FBI Agent Lauren Williamson also interviewed Jones at the scene, and Jones "admitted [to] using Ares to download child pornography, but he estimated that he had done so 'less than 100' times." *Id.* Jones then agreed to go with the agents to the FBI office for further questioning. At the office, Jones waived his *Miranda* rights, agreed to an interview with FBI Agent Michael Fitzgerald, and confirmed that he had pleaded guilty in 1991 "to a sexual offense involving a young family member[.]" *Id.* And Jones explained that he had a sexual relationship

with his twenty-one-year-old stepdaughter that began when she was sixteen and that she was then pregnant with his child. *Id.*

After an indictment and a trial, a jury convicted him for advertising, distribution, and receipt of child pornography in violation of 18 U.S.C. §§ 2251(d) and 2252A(a)(2). *Id.* at 350. A probation officer prepared Jones's Presentence Report (PSR) and recommended the district court enhance Jones's sentence five levels for "engag[ing] in a pattern of activity involving the sexual abuse or exploitation of a minor" under United States Sentencing Guidelines § 2G2.2(b)(5). (A.R. 8-1, PSR, PageID 8 (citing U.S.S.G. § 2G2.2(b)(5)).) The district court agreed and enhanced Jones's sentence five levels for the pattern-of-activity enhancement. It based that enhancement in part on Jones's sexual relationship with his stepdaughter. *Jones*, 747 F. App'x at 350. It sentenced Jones to 660 months' imprisonment and ordered Jones to pay $10,000 in restitution to a trust for Vicky. *Id.* at 352.

Then came Jones's first appeal. We rejected Jones's various challenges to his conviction. But we vacated Jones's sentence and remanded for resentencing. We found that the trial court erred in enhancing Jones's sentence under § 2G2.2(b)(5) based solely on the "presentence report's recommendations without further consideration or fact finding." *Id.* at 359. The government had conceded as much on appeal but contended that the trial court could have relied on other evidence to apply the enhancement. We decided, however, that those alternative theories "are better reserved for the district court on remand, because they involve questions of fact that the district court clearly did not resolve during the initial sentencing hearing." *Id.*

We also found that the district court had "failed entirely to explain its [] restitution award, [so] we c[ould ]not engage in meaningful appellate review." *Id.* at 360–61. So we instructed the

district court on remand to "redetermine the amount of restitution and provide sufficient analysis" for that determination. *Id.* at 361.

On remand, a different district judge resentenced Jones. To do so, the court considered whether it should once again enhance Jones's sentence under § 2G2.2(b)(5). The government argued the court should for two reasons. First, the government pointed to a photograph depicting oral sex allegedly between an adult male and a female child (Jones's step-daughter as a minor). Second, the government argued that the basis for Jones's 1991 conviction could also satisfy § 2G2.2(b)(5). It explained that though Jones "was [originally] charged . . . with attempted rape[,]" "the case was pled down to gross sexual imposition." (R. 176, Resentencing Tr., PageID 2477.) And a police report detailed the allegations—four instances of Jones's sexual conduct with a minor (his sister)—that initiated the investigation that led to the 1991 conviction. And the government argued that Jones's 1991 guilty plea to the lesser charge "corroborated" the allegations in the report. (*Id.* at 2479.)

Jones, however, urged the court to find § 2G2.2(b)(5) inapplicable for four reasons. First, he argued that the photograph offered by the government cannot serve in part as a basis for the sentencing enhancement. He explained that the "production of pornography" (the photograph) is the type of action—"trafficking in material relating to the sexual abuse or exploitation of a minor"—that falls outside the enhancement's scope. (*Id.* at 2479–80 (referencing § 2G2.2(b)(5) cmt. n.1).)

Second, Jones explained that the photograph the government referenced did not in fact depict him and a minor victim. It instead depicted "an adult . . . [and] the adult's husband[.]" (*Id.* at 2481.) As support for his position, he used his sister-in-law's affidavit in which she swore that she believed the photograph depicted her and her husband (both as adults). Third, Jones argued

that the government failed to show that his 1991 conviction "comes within" the enhancement's scope. (*Id.* at 2486.)

Last, Jones argued against the reliability of the allegations described in the police report connected to the 1991 conviction given the complainant's age then and the uncertainty over the procedures the officers used to obtain those statements. He also "maintain[ed]" that he "denied ever sexually abusing his sister[.]" (*Id.* at 2471 (explaining that he "maintain[ed]" the objections raised in his Presentence Report); A.R. 8-1, PSR, PageID 11.) To support that position, he asserted that "his sister later admitted" Jones never sexually abused her. (A.R. 8-1, PSR, PageID 11; *see id.* at 9 (noting "the government indicated the defendant has produced no evidence that the victim . . . later admitted she had lied").) But E.J. could not testify because she passed away in 2002. (*Id.* at 11.)

After hearing from both parties, the district court again enhanced Jones's sentence under § 2G2.2(b)(5) based on the E.J.'s allegations—that Jones "ha[d] the minor victim touch [Jones's] penis and [also] fondl[ed] the victim while the victim touched him"—described in the police report. (R. 176, Resentencing Tr., PageID 2486–87 (explaining that the past conviction and the police report "alone" allowed the court to "find that [the sentencing enhancement] has been satisfied" and so the court need "not . . . consider the photograph or production of pornography or any conduct with the stepdaughter").) The court acknowledged that the police report contains hearsay and lacks any quoted language which leaves the reader to guess what the minor said and what the adult police officer wrote. But the court explained "that law enforcement officers are charged with the responsibility of accurately transmitting statements" and the court considered that factor when evaluating the statement's trustworthiness. (*Id.* at 2488.) The court also reasoned that, despite the complainant's age, her allegations "[were] very specific[,]" they "refer[red] not to

one, but [to] multiple occasions[,] and the number of times is fairly specific as well." (*Id.* at 2486–87.) And although Jones "was not convicted of" the acts detailed in the report, "he did in the context of th[at] investigation end up pleading guilty to . . . conduct that was sexually related in some kind . . . [and that] reflects the defendant's acknowledgement that he engaged in sexually inappropriate conduct of some kind involving th[e] minor" victim. (*Id.* at 2487.) So the court found that "there are indicia of trustworthiness in th[e] [police report's] statement[s]" that allowed the court to rely on the report to impose the enhancement. (*Id.* at 2486–88 (explaining that "the Court does believe that it can credit th[e] statement").)

After ruling on the enhancement, the court heard the parties' arguments on restitution. Jones asked the court to assess "no restitution" because he argued that the court could not find the required causation between Jones's actions and the harm Vicky suffered. (*Id.* at 2502–03; *see also id.* at 2501 (explaining that Jones "didn't actively do anything except [] have the Ar[]es [program] which passively allow[ed the distribution of child porn depicting Vicky] to occur").) The government flagged for the court that Vicky's attorneys requested "10,000 dollars" as restitution and that the government "submitted [its] paperwork in support of that[.]" (*Id.* at 2500.) In response to Jones, the government also explained that "restitution's mandatory . . . under the statute." (*Id.* at 2507.) And it responded to Jones's causation argument. It explained that Ares users could turn off sharing and continue to use the program. But "in the world of child pornography," users choose not to and purposefully label their files with names "known by people with a sexual interest in children[.]" (*Id.* at 2509–10 (explaining that those names included the child's age and specific acts depicted).) So Jones did act. By "leaving his network open and by virtue of the titles" of Jones's files, Jones "was advertising to others that he had [videos depicting Vicky] available to download." (*Id.* at 2510.)

The court found causation. The court acknowledged that

> it's almost impossible if not impossible for someone who's been victimized through the production of pornography to establish specific harm that's linked to a particular individual who later views it other than the fact that the victim knows that people unidentified will view the pornography and that creates undoubtedly psychic harm[.]

(*Id.* at 2504; *see also id.* at 2521.) Given that reality, the only way to "link" the harm and the defendant's actions in those kinds of cases is "through the principle that the victim suffers continued psychic harm as a result of knowing that people such as the defendant continue to view and make available and transmit these terribly destructive images[.]" (*Id.* at 2521–22; *see also id.* at 2504.) "[I]n that sense[,]" the court explained, "there is causation . . . sufficient to satisfy" relevant precedent. (*Id.* at 2522.)

The court calculated the appropriate restitution in light of its causation finding. It reasoned that a "rational" method to reach the appropriate restitution amount in a case like this one "would be to take the total amount of the loss and divide into that the total number of claims." (*Id.* at 2521; *see also id.* at 2504–05.) Noting that Vicky's attorney claimed "4,462,040 dollars" as Vicky's "total amount of loss[,]" the court divided that total by 600 (the total "standing orders for restitution") to arrive at the restitution amount "of 7,436 dollars." (*Id.* at 2504, 2521.)

The court then resentenced Jones. To do so, it heard from both parties on the factors under 18 U.S.C. § 3553. The court then balanced those factors itself and explained how the factors weighed in Jones's case. As part of its resentencing, the court had also noted that Jones faced a guideline range of 1,800 months. Despite that guideline, the court varied downwards and resentenced Jones to 360 months' imprisonment. Jones appeals.

**II.**

On appeal, Jones asks us to again vacate his sentence and to vacate the court's restitution order.

**A.**

"We review sentencing decisions for reasonableness 'under a deferential abuse-of-discretion standard.'" *United States v. Berringer*, 393 F. App'x 257, 260 (6th Cir. 2010) (quoting *Gall v. United States*, 552 U.S. 38, 41 (2007)). A defendant's sentence must be both procedurally and substantively reasonable. *See United States v. Paull*, 551 F.3d 516, 526 (6th Cir. 2009).

Jones lodges a procedural challenge against his sentence. He urges us to vacate his sentence because the district court erred when it applied the sentencing enhancement under § 2G2.2(b)(5). Jones supports his position with two reasons. First, Jones argues that his 1991 conviction cannot qualify as a basis for the sentencing enhancement. Second, he claims that the police report "does not possess the requisite minimum indicia of reliability to support the . . . enhancement[.]"[1] (Appellant's Br. at 11–12.) That "unreliability[,]" Jones claimed, "is exacerbated" by E.J.'s age at the time of the allegations. (*Id.* at 13.) He takes the position that police reports are fundamentally unreliable and that "renders" the hearsay information in the report "inadmissible, regardless of whether proffered pursuant to" Federal Rules of Evidence 803(6) or 803(8). (*Id.* at 12.)

---

[1] The government interprets Jones's opening brief as arguing "that the district court could not rely on E.J.'s statements [because] . . . the statements would be inadmissible under the Federal Rule[s] of Evidence[.]" (Appellee's Br. at 12.) But Jones acknowledges in his reply brief that a court may look to evidence usually inadmissible at trial during sentencing. He clarifies that he mentioned those rules in his opening brief because, although courts may rely on that evidence for sentencing, it may do so only if that evidence is reliable. So we interpret Jones to argue not that the Federal Rules of Evidence should apply to sentencings but that any evidence used for sentencing purposes (including those otherwise inadmissible at trial) must be reliable.

Section 2G2.2(b)(5) provides for a five-level enhancement "[i]f the defendant engaged in a pattern of activity involving the sexual abuse or exploitation of a minor[.]" "[A]ny combination of two or more separate instances of the sexual abuse or sexual exploitation of a minor by the defendant" no matter if that conduct led to a conviction qualifies as a "[p]attern of [that] activity[.]" § 2G2.2 cmt. n.1. And "conduct described in" various federal criminal statutes or "an attempt or conspiracy to commit" those federal crimes qualify as "[s]exual abuse or exploitation[.]" *Id.* But "'[s]exual abuse or exploitation' does not include possession, accessing with intent to view, receipt, or trafficking in material relating to the sexual abuse or exploitation of a minor." *Id.*

To support a § 2G2.2(b)(5) enhancement, "[t]he district court is permitted to find facts . . . by a preponderance of the evidence." *United States v. Hammond*, 637 F. App'x 897, 901 (6th Cir. 2016); *see also Berringer*, 393 F. App'x at 262 (describing this as "a factual determination that the sentencing court need find only by a preponderance of evidence"). The district court may look beyond *Shepard*-approved documents and even "routinely rely on hearsay for the factfinding part of a sentencing decision." *United States v. Armstrong*, 920 F.3d 395, 398 (6th Cir. 2019); *see also Hammond*, 637 F. App'x at 901. The information used need only have a "sufficient indicia of reliability to support its probable accuracy." U.S.S.G. § 6A1.3(a); *see United States v. Davis*, 751 F.3d 769, 778 (6th Cir. 2014). In other words, that information considered must have "*some* evidentiary basis" that satisfies that "minimal . . . reliability" threshold. *Armstrong*, 920 F.3d at 398 (quoting *United States v. Silverman*, 976 F.2d 1502, 1504 (6th Cir. 1992)).

"[W]e review [a district court's] reliability decisions [during sentencing] under the highly deferential, clearly erroneous standard." *Id.*; *id.* at 398 n.2 (discussing *United States v. Santana*, 723 F. App'x 331, 337–38 (6th Cir. 2018)). We review findings of fact under that same standard. *Berringer*, 393 F. App'x at 261. "A factual finding is clearly erroneous 'when the reviewing court

on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Id.* (quoting *United States v. Lalonde*, 509 F.3d 750, 763 (6th Cir. 2007)). And we review the district court's legal conclusions de novo. *Id.*

Jones's first argument fails. The district court based its decision to enhance Jones's sentence under § 2G2.2(b)(5) on E.J.'s allegations detailed in the police report and not on the 1991 conviction. (R. 176, Resentencing Tr., PageID 2487 (explaining that the court "can credit th[e] statement" in the police report and "based on this *alone*, a Court can find" the enhancement "has been satisfied" and announcing that "based on the police report statements, the Court is going to" apply the enhancement (emphasis added)).) The district court mentioned the 1991 conviction only because it tended to support the veracity of the allegations in the police report. "Although [Jones] . . . was not convicted" of the acts detailed in that report and while the court "d[id]n't have the definition[] of th[e] specific crime" for his 1991 conviction, that conviction "nonetheless reflects the defendant's acknowledgement that he engaged in sexually inappropriate conduct of some kind involving this minor." (*Id.*)

The second reason Jones offers also fails. We have approved a sentencing court's reliance on a police report to make factual findings. In fact, we have found no clear error in a sentencing court's factual findings based at least in part on hearsay statements made in those reports.[2]

---

[2] Jones asserts that hearsay information in police reports renders the reports insufficiently reliable for sentencing purposes. He cites various cases from this and other circuits to support his position. But every case he cites for that position is inapt.

Most of those cases deal only with how a district court must apply hearsay rules in the Federal Rules of Evidence during trial. *See United States v. Orellana-Blanco*, 294 F.3d 1143, 1149–50 (9th Cir. 2002); *United States v. Pena-Gutierrez*, 222 F.3d 1080, 1086–87 (9th Cir. 2000); *United States v. Mackey*, 117 F.3d 24, 28–29 (1st Cir. 1997); *Miller v. Field*, 35 F.3d 1088, 1091 (6th Cir. 1994); *United States v. Pazsint*, 703 F.2d 420, 424–25 (9th Cir. 1983); *United States v. Orozco*, 590 F.2d 789, 793 (9th Cir. 1979); *United States v. Shoupe*, 548 F.2d 636, 642 (6th Cir. 1977). But those hearsay rules do not apply during sentencing. *United States v. Graham-Wright*,

For example, in *United States v. Shipman*, a panel of this court credited hearsay statements

in an unsworn police report over the defendant's own sworn testimony to find the defendant did

in fact violate his supervised release. 215 F.3d 1328, 2000 WL 687686 (6th Cir. 2000) (table). In

that case, an FBI agent "alerted [a probation officer] to a recent carjacking in the area by a man

matching [the defendant's] description" on the same day Shipman paid part of a fine imposed as

part of his supervised release. *Id.* at *1. Based on the FBI agent's statements and those

circumstances, another police officer created an unsworn police report that the defendant violated

his supervised release by conducting the carjacking. *Id.* (explaining that probation officer "learned

through an FBI agent that a police report had been filed"). The district court had the chance to

examine the police report, hear testimony from the probation officer (not the officer who created

the police report), and hear the defendant's sworn testimony contrary to the report. *Id.* at *2–4

---

715 F.3d 598, 601 (6th Cir. 2013) (explaining that the Federal Rules of Evidence "do not apply at sentencing hearings").

The rest discuss only whether courts may use police reports when evaluating whether a prior conviction qualifies as a predicate offense for the Armed Career Criminal Act (ACCA) or the sentencing guidelines. *See United States v. Diaz-Calderone*, 716 F.3d 1345, 1350 (11th Cir. 2013); *United States v. Thigpen*, 456 F.3d 766, 770 (7th Cir. 2006).

The Supreme Court held in *Shepard v. United States* that sentencing courts could not look to police reports for enhancements under the ACCA. 544 U.S. 13 (2005). But *Shepard* restricted its holding to the context of interpreting that particular statute. *Id.* at 26; *see also, e.g.*, *United States v. Leekins*, 493 F.3d 143, 149 (3d Cir. 2007) (explaining that *Shepard* "did not state that police reports were inadmissible as a general matter in sentencing hearings"). Even after *Shepard*, we have continued using police reports during sentencing outside the context of analyzing whether a prior conviction qualifies as a predicate offense for a sentencing enhancement. *Compare United States v. Al-Cholan*, 610 F.3d 945, 954–55 (6th Cir. 2010) (finding that a police report helped corroborate hearsay testimony and both supported the district court's "imposition of a sentence enhancement under U.S.S.G. § 4B1.5(b) on the basis of 'a pattern of activity involving prohibited sexual conduct'") *with United States v. McGrattan*, 504 F.3d 608, 611 (6th Cir. 2007) (looking only to *Shepard* documents to determine whether a prior state conviction qualifies as a predicate conviction for the fifteen-year mandatory minimum under 18 U.S.C. § 2252A(b)(1)). And we have explained that "the district court is *not* limited to *Shepard*-approved documents" to determine whether a defendant's prior conduct satisfies § 2G2.2(b)(5)'s pattern-of-activity enhancement because the district court may find facts in that context by a preponderance of the evidence. *Davis*, 751 F.3d at 778 (emphasis added).

(explaining that an FBI agent also testified to "the purported victim['s] . . . 'extensive criminal history'" after Shipman alleged "the purported victim . . . had recanted" his earlier statements). It "expressly found [Shipman's contrary] testimony . . . unreliable and uncorroborated by other evidence." *Id.* at *3 (explaining that "Shipman's credibility record before the district court was doubtful"). So it found the police report "more reliable and trustworthy *despite* its hearsay nature" and concluded the defendant violated his supervised release. *Id.* at *2–3 (emphasis added) ("presum[ing]" without confirming that the police report "was corroborated . . . by the police on the scene"). This court found "no clear error in the finding" that the defendant violated his supervised release. *Id.* at *3.

Despite permitting sentencing courts to make factual findings based on a police report's hearsay allegations, we have explained that "[w]e do not endorse the regular use of police reports as evidence in sentencing determinations." *United States v. Jackson*, 477 F. App'x 377, 379 (6th Cir. 2012). And we have not taken the step of asserting that sentencing courts may find *all* police reports inherently reliable. *Shipman*, 2000 WL 687686, at *4. Nor have we taken the step of finding all police reports inherently *un*reliable.[3] *E.g.*, *United States v. Ford*, 571 F. App'x 378,

---

[3] Jones urges us to find police reports categorically unreliable for sentencing purposes. To support his position, Jones cites three cases: one Supreme Court case and two cases from the Seventh Circuit. He asserts that those cases show the Supreme Court has already "rebuffed the government's request to premise a sentencing enhancement upon the contents of a police report" and urges us to do the same. (Reply Br. at 2–3.)

They do not. Jones again unsuccessfully cites *Shepard*, 544 U.S. at 13, for his position. *See supra* note 3, at 11. The panel in the second case he cites found that the district court appropriately used the categorical approach to analyze offenses listed in the defendant's PSR to find that the defendant's "prior convictions were qualifying offenses" for the career offender enhancement even though the defendant's PSR "reference[d] underlying documents[.]" *United States v. Black*, 636 F.3d 893, 897–99 (7th Cir. 2011). So that case also offers no support. And the last case offers no support as well. The court in that case found the incident report included "*no* information" that tended to support the sentencing enhancement—not that police reports generally cannot support an enhancement. *United States v. Sanchez*, 507 F.3d 532, 538 (7th Cir. 2007) (emphasis added).

383 (6th Cir. 2014) (explaining that a victim's unavailability at sentencing "does not bar" the sentencing court from imposing a sentencing enhancement for an uncharged felonious assault under U.S.S.G. § 2K2.1(b)(6)(B) "so long as *reliable evidence, such as a 911 call or police report*[] supplies the requisite facts" (emphasis added)).

Other courts agree. *E.g.*, *United States v. Padilla*, 793 F. App'x 749, 757 (10th Cir. 2019) (explaining that a sentencing court may after evaluation "find that certain features of the police report itself—such as its level of detail, internal consistency, and quality—independently support the probable accuracy of the relevant information contained therein"); *United States v. Ruby*, 706 F.3d 1221, 1230 (10th Cir. 2013); *United States v. Lloyd*, 566 F.3d 341, 346 (3d Cir. 2009); *cf. United States v. Coonce*, 932 F.3d 623, 641 (8th Cir. 2019) (explaining that the court "ha[s] been suspicious" of the reliability of police reports but that the court "assess[es] reliability 'case-by-case'" and finding that the Bureau of Prison misconduct reports had sufficient indicia of reliability so that the court could use them during a capital sentencing (quoting *United States v. Johnson*, 710 F.3d 784, 789 (8th Cir. 2013))).

So we must evaluate whether the trial court clearly erred when it found the police report and allegations in the report sufficiently reliable in this case to support the pattern-of-activity enhancement. We find it did not.

The district court found the police report's own features made it sufficiently reliable for three reasons. First, it found the information's source (law enforcement) supported a finding that the report accurately represented E.J.'s allegations. Second, the allegations' characteristics—recounting "very specific" acts and a "specific" number of multiple occasions (four)—supported the report's reliability as well. Last, the court found those characteristics alleviated any negative effect E.J.'s age at the time of those allegations had on the report's reliability. While Jones may

correctly observe that a declarant's age may affect a statement's reliability, the district court considered that possibility and found it did not overcome the report's other indicia of reliability.

The court also found evidence in the record external to the police report's own features tended to support the reliability of the report and its allegations. The court found that Jones's eventual guilty plea to the lesser offense—the result of the investigation initiated by the police report—corroborated the information in the police report. In the face of Jones's weak support for his position that he never sexually abused his sister—his unsupported assertion that his sister later recanted the allegation—we cannot find the court clearly erred when it found the police report more reliable. Reviewing the "entire evidence" does not "le[ave us] with the definite and firm conviction that" the district court made "a mistake" when it found Jones sexually abused his sister at least twice. *Berringer*, 393 F. App'x at 261 (quoting *Lalonde*, 509 F.3d at 763).

At least one other court has evaluated whether a district court may rely *only* on a police report to establish a sentencing fact. In *Padilla*, the Tenth Circuit found that it could not uphold the sentencing court's factfinding based only on a police report *in that case*. 793 F. App'x at 757, 762. There, the defendant, Padilla, pleaded guilty to knowingly and intentionally distributing heroin in violation of 21 U.S.C. § 841(a) and (b)(1)(C). *Id.* at 750–51. Padilla's PSR included an earlier state offense where Padilla allegedly possessed 17.38 grams of methamphetamine and a .25 caliber pistol during a traffic stop. *Id.* at 751. The inclusion of the methamphetamine and the pistol increased Padilla's base offense level from sixteen to twenty two. *Id.* at 751–52. Padilla made written objections to the PSR and argued that "no evidence pertaining to the methamphetamine and firearm had been provided during discovery, and . . . that the government had not shown that any relevant evidence was sufficiently reliable to establish the sentencing facts necessary to support the enhancements at issue." *Id.* at 752. The government's response did not

address Padilla's reliability concerns. *Id.* In a later addendum to the PSR, "the Probation Office responded to [] Padilla's objection" and explained that a state police report provided evidence of the methamphetamine and firearm. *Id.*

At the sentencing hearing, Padilla again objected to the PSR's inclusion of the methamphetamine and the firearm because he claimed "[n]one of that evidence was brought into this case." *Id.* (quoting the sentencing transcript). The government referred the court to its earlier written response—the one that failed to address Padilla's reliability concerns. *Id.* at 753. And the government at that point "[s]ignificantly . . . did not attempt to enter into evidence th[at] police report . . . or any other evidence to establish" those facts. *Id.* But the *Padilla* district court overruled Padilla's objection anyway. *Id.*

The Tenth Circuit found that the trial court clearly erred. It explained that the district court "did not cite any evidence in the record to corroborate" its factfinding during sentencing—that the defendant possessed 17.38 grams of methamphetamine and a firearm. *Id.* at 757. The court instead overruled the defendant's objection "that there was no reliable evidence to support" the government's argument "based on a finding that 'the . . . police report is sufficiently reliable to establish a sentencing fact.'" *Id.* (original alterations omitted) (quoting the sentencing transcript). And it did so even though no party—even in response to Padilla's renewed objection during the sentencing hearing—had introduced that police report into evidence. *Id.* at 753. Given that, and the fact that Padilla had "made the government aware of the deficiency in its sentencing evidence, and yet the government made no effort to cure that deficiency," the Tenth Circuit reversed the district court's sentencing judgment and remanded for resentencing. *Id.* at 764. It also "limit[ed] its] remand such that the district court must resentence [] Padilla based on the record as it [] st[ood]" at the time of the panel's review—without the police report. *Id.*

But the *Padilla* court agreed that "*some* police reports contain sufficient indicia of reliability to support the probable accuracy of information that they contain[.]" *Id.* at 757–58. It explained that a sentencing court could not, however, assume a police report's reliability and instead "must [make] a finding that the *specific* document at issue contains sufficient indicia of reliability[.]" *Id.* at 759 (discussing police reports). Sentencing courts "may [also] find that certain features of the police report itself . . . independently support the probable accuracy of the relevant information contained therein." *Id.* at 757. It thus concluded that in general, sentencing courts may only use police reports to resolve a disputed sentencing fact where "there is evidence in the record to corroborate that information, or the specific police report in question is in evidence and contains sufficient indicia of reliability to support the probable accuracy of the relevant information." *Id.* at 762.

The sentencing court's application of the pattern-of-activity enhancement here does not raise the same concerns that the report did in *Padilla*. The government *did* enter the police report into evidence.[4] (*See* R. 168-3, Police Report, PageID 2426–27.) The district court here *also* did

---

[4] We note that Jones attempted during resentencing to argue that the government could not "expand the record on a remand" and enter that police report into evidence during resentencing. (R. 176, Resentencing Tr., PageID 2474.) But the government responded that it could because we had not limited our remand for resentencing to the original record. We agree. When we remand for resentencing and do not explicitly "require[] that the district court conduct the resentencing on the original record[,]" the district court may consider evidence not in the record before resentencing. *United States v. Stout*, 599 F.3d 549, 554 (6th Cir. 2010).

We did not limit the district court's resentencing to the record that existed at the time of the appeal. While on appeal, we vacated Jones's sentence. *Jones*, 747 F. App'x at 359. Doing so, we noted that the government during oral argument raised "alternative theories for enhancement under § 2G2.2(b)(5)" including the possibility of inferring that Jones abused E.J. on multiple instances based on the offense dates on the charging documents for the 1991 conviction. *Id.* But we "decline[d] to resolve such factual disputes on appeal" and explained that "the district court should consider the government's alternative arguments for enhancing Jones's sentence on remand." *Id.* In our instructions to the district court, we simply "remanded [the case] for resentencing in accordance with this opinion." *Id.* at 361. And in fact Jones *himself* "introduce[d]

not blanketly assume the reliability of all police reports. Instead it tailored its evaluation to the police report at hand and evaluated that police report's features. It found that those features "independently support[ed] the probable accuracy of the relevant information contained therein." *Padilla*, 793 F. App'x at 757. And it even found that other evidence in the record—Jones's 1991 plea to a lesser offense—corroborated the allegations contained in that police report.

We cannot find that the district court clearly erred when it concluded the preponderance of the evidence showed Jones did in fact sexually abuse E.J. at least twice. The district court appropriately applied the pattern-of-activity enhancement.

**B.**

"[F]ederal courts have no inherent power to award restitution[.]" *United States v. Church*, 731 F.3d 530, 535 (6th Cir. 2013) (quoting *United States v. Evers*, 669 F.3d 645, 655–56 (6th Cir. 2012)). So "restitution orders are proper 'only when and to the extent authorized by statute.'" *Id.* (same). Congress has made it mandatory for courts to impose restitution orders "in addition to any other civil or criminal penalty authorized by law . . . for" §§ 2251(d) and 2252A(a)(2) convictions. 18 U.S.C. § 2259(a). We review the propriety of a restitution order de novo and review the amount of restitution awarded for an abuse of discretion. *Church*, 731 F.3d at 535.

Jones also presents two reasons for vacating the district court's restitution order. He first argues against the legality of any restitution order in his case. (Appellant's Br. at 18–23 (arguing that his actions did not satisfy the statute's "threshold requirement" so the district court could not legally impose any restitution order (quoting *Paroline v. United States*, 572 U.S. 434, 449 (2014))).) But the government asserts that the panel in Jones's first appeal issued only a limited remand to give sufficient reasoning for the restitution amount awarded and "not to determine

---

new evidence"—psychological evaluation records for mitigation purposes—into the record during resentencing. (R. 176, Resentencing Tr., PageID 2474.)

whether a restitution award should issue" at all. (Appellee's Br. at 14.) Whether the government is correct is ultimately not material, however, because we reject Jones's argument regardless.

Before evaluating the merits of Jones's first argument though, we note that between Jones's appeal and his resentencing, Congress amended the restitution statute in December 2018. Neither party has raised the effect of the amended statutory language, if any, on Jones's case. Regardless, Congress's 2018 amendment has no effect on our resolution of Jones's first argument. Under either version of § 2259, and even if Jones could now refute the legality of the district court's restitution order, we would still reject his first argument.

In *Paroline*, the Supreme Court dealt with facts almost identical to the ones in this case. There, the petitioner pleaded guilty to a child pornography offense after admitting to possessing between 150 and 300 images of child pornography (including images of a victim identified as "Amy"). *Paroline*, 572 U.S. at 439. The Court evaluated the statute in place before Congress's 2018 amendment to determine whether and when a district court may impose a restitution order compensating a child pornography victim for a defendant's actions.

Doing so, the Court first found that the statute's definition of "victim" "plainly suggest[s a] causation [requirement]" for restitution orders under that provision. *Id.* at 445. It also found that the statute's text included "the requirement of proximate cause" as part of that general causation requirement. *Id.* at 446–48 (finding the 1996 provision's inclusion of a "final catchall category for 'any other losses suffered by the victim as a *proximate result* of the offense'" imposes "a general proximate-cause limitation" on when "[r]estitution is [] proper" under that statute (emphasis added) (quoting 18 U.S.C. § 2259(b)(3)(F) (1996))). The Court then grappled with "the proper standard of causation in fact" and found that while "it is not possible to identify a discrete, readily definable incremental loss [the defendant] caused, it is indisputable that [the defendant]

was a part of the overall phenomenon that caused [the victim's] general losses." *Id.* at 449, 456–57. Thus, it concluded § 2259 did apply in petitioner's case. *Id.* at 458–59. So under *Paroline*, Jones's argument against the district court's ability to impose a restitution order fails.

The 2018 amended statute does not change matters materially in this respect. The applicable provision in the amended statute retains the same general causal requirement that the *Paroline* Court found in the earlier version. § 2259(b)(2), 2259(c)(4). That new text also retains an explicit reference to a proximate cause requirement like the version that the *Paroline* court construed. *See id.* § 2259(b)(2)(A) (requiring the court to first find the "full amount of the victim's losses" resulting from the trafficking offenses); *see also id.* § 2259(c)(2) (defining "full amount of the victim's losses" to include "any costs incurred, or that are reasonably projected to be incurred in the future, by the victim . . . as a *proximate result* of all trafficking in child pornography offenses involving the same victim" (emphasis added)). And Congress explicitly instructs courts to apportion those losses to defendants "in an amount that reflects the defendant's relative role in the causal process that underlies the victim's losses[.]" *Id.* § 2259(b)(2)(B). Applying the amended statute, we would also disagree with Jones's first argument.

Under either version of § 2259, Jones's second argument on the restitution order also fails. After refuting the legality of any restitution order, Jones challenges the amount of restitution the district court ordered. He specifically urges us to find that the court abused its discretion in calculating the restitution amount.

Before Congress amended the statute, the Supreme Court explained that the district court's determination of the proper restitution amount "cannot be a precise mathematical inquiry[.]" *Paroline*, 572 U.S. at 459 (explaining that "district courts by necessity 'exercise discretion in fashioning a restitution order'" (original alteration omitted) (quoting 18 U.S.C. § 3664(a))). But

it explained that "where multiple defendants [] have 'contributed to the loss of a victim[,]' . . . [the court] may 'apportion liability among the defendants to reflect [each defendant's] level of contribution to the victim's loss[.]'" *Id.* (quoting § 3664(h)). And a district court exercises similar discretion to "[a]ssess[] an individual defendant's role in the causal process behind a child-pornography victim's losses[.]" *Id.*

For example, the Supreme Court suggested that "district courts might, as a starting point, determine the amount of the victim's losses caused by the continuing traffic in the victim's images" (excluding remote losses). *Id.* at 460. After that, the court may "then set an award of restitution" for a particular defendant "in consideration of factors that bear on the relative causal significance of the defendant's conduct in producing those losses . . . includ[ing] the number of past criminal defendants found to have contributed to the victim's general losses[.]" *Id.* The Court explained that courts should "do their best to apply the [restitution] statute as written in a workable manner" to faithfully uphold "the competing principles at stake"—the need to compensate the victims, to "h[o]ld" defendants "account[able] for the impact of their conduct on those victims," and to make "defendants . . . liable for the consequences and gravity of their own conduct, not the conduct of others." *Id.* at 462.

Under the newly amended language, Congress directs district courts to use a two-step method to determine the restitution amounts for defendants found trafficking in child pornography. It directs that "court[s] shall determine the full amount of the victim's losses that were incurred or are reasonably projected to be incurred by the victim as a result of the trafficking in child pornography depicting the victim." § 2259(b)(2)(A). After that, "the court shall order restitution in an amount that reflects the defendant's relative role in the causal process that underlies the victim's losses, but which is no less than $3,000." *Id.* § 2259(b)(2)(B).

The district court here accepted "4,462,040 dollars" as Vicky's "total amount of loss" based on the "attorney summary on behalf of . . . Vick[y.]"[5] (R. 176, Resentencing Tr., PageID 2521.) The court then divided that total amount by 600 (the total "standing orders for restitution") to arrive at the restitution amount "of 7,436 dollars." (*Id.* at 2505, 2521.) We cannot say the district court abused its discretion.[6]

## III.

Congress and the sentencing guidelines impose harsh consequences on those who traffic in child pornography images. Those harsh consequences reflect the perceived continuous harm child pornography has on its victims. Our job is not to evaluate those policy judgments but to apply the relevant statutes and sentencing guidelines as written. The district court did just that. So we AFFIRM.

---

[5] Jones argues that the district court abused its discretion when arrived at that value for the total loss amount because it had during the sentencing hearing mentioned a "3.2 million loss[.]" (Appellant's Br. at 25 (quoting R. 176, Resentencing Tr., PageID 2508).) But looking at the sentencing transcript, it's clear that the sentencing court raised that earlier loss figure as a hypothetical and recognized that figure represented *only* Vicky's medical losses and not her total loss. Before the language Jones quotes, the district court *suggested* "maybe a reasonable approach is to take the total cost which is alleged here to be something like 3.26 million dollars *in I think just aggregated medical costs* and" to divide that value by the total standing orders for restitution. (R. 176, Resentencing Tr., PageID 2504–05 (emphasis added).) But the district court explained later that it found Vicky's *total* loss based on the attorney's summary on behalf of Vicky and then used the methodology she earlier suggested—dividing the loss amount by the total standing orders. The district court did not abuse its discretion.

[6] We briefly note the amended statute also requires that "[a] victim's total aggregate recovery pursuant to this section shall not exceed the full amount of the victim's demonstrated losses." § 2259(b)(2)(C). The district court made no mention of whether the victim had already received restitution in the full amount of her losses, such that further payments to the victim should be terminated, as the statute appears to require. That said, record evidence on Vicky's losses shows that she has received only $858,093.85 out of a $4,462,040.96 aggregate loss amount. *See id.* And Jones presents no evidence to the contrary. So if the district court made any error, it is not plain. And in any event, no error affected Jones's substantial rights.

**KAREN NELSON MOORE, Circuit Judge, concurring in part and dissenting in part.**

The majority directs an empty nod toward the principle that "[w]e do not endorse the regular use of police reports as evidence in sentencing determinations." Maj. Op. at 12 (quoting *United States v. Jackson*, 477 F. App'x 377, 379 (6th Cir. 2012)). It then proceeds to uphold the district court's enhancement of Tommy Lee Jones's sentence based on a few lines of text from a thirty-year-old, uncorroborated police report that investigated an alleged rape for which Jones was not ultimately convicted. Because the district court's reliance on this unreliable police report was clearly erroneous, I dissent from the majority's affirmance of Jones's sentence.[1]

\*\*\*

In resentencing Jones, the district court in this case concluded that a five-level enhancement applied because Jones had "engaged in a pattern of activity involving the sexual abuse or exploitation of a minor." U.S.S.G. § 2G2.2(b)(5). This conclusion was based solely on the district court's review of a 1990 police report from a different case, investigating an incident of sexual misconduct, that stated the following:

> Th[e] victim [Jones's sister] also stated to Officer Berg #1380, that another brother, who is the named suspect [Jones], would take her into the bathroom, then take out his penis and this male would have the victim touch his penis. This male also made the victim lay down in the bedroom and would fondle the victim while the victim touched him. The victim stated it happened twice last year and twice this year.

R. 168-3 (Police Rep. at 7) (Page ID #2426). The district court provided four reasons for relying on this report in applying the enhancement. First, the report was "very specific." R.176 (Resent'g Hr'g Tr. at 21) (Page ID #2487). Second, "it refers not to one, but multiple occasions and the number of times is fairly specific as well." *Id.* Third, "[a]lthough [Jones] was not convicted of these acts," he later pleaded guilty to gross sexual imposition. *Id.* Fourth, "law enforcement

---

[1] I concur in the majority's conclusion that the district court did not abuse its discretion in imposing an order of restitution.

officers are charged with the responsibility of accurately transmitting statements," so the report should be credited. *Id.* at 22 (Page ID #2488). On this basis, the district court applied the sentence enhancement.

Despite its shaky constitutional foundation, *see United States v. Bell*, 808 F.3d 926, 928 (D.C. Cir. 2015) (Kavanaugh, J., concurring in the denial of rehearing en banc), the rule permitting a district court to increase a defendant's sentence based on facts no court or jury has found to exist beyond a reasonable doubt is well established. Still, due process requires that the factual findings supporting sentencing "have some minimal indicia of reliability." *United States v. Silverman*, 976 F.2d 1502, 1504, 1506 (6th Cir. 1992) (en banc); *see United States v. Hunt*, 487 F.3d 347, 352 (6th Cir. 2007) (at sentencing, co-conspirators' statements "required, as hearsay, sufficient indicia of reliability in order to support the district court's conclusion"). The question on appeal is whether the district court's exclusive reliance on an old police report in applying the pattern-of-activity enhancement was clearly erroneous. I believe it was for four reasons.

*First*, as an initial matter, we have explicitly discounted the reliability of police reports for sentencing purposes. In *United States v. Jones*, 453 F.3d 777 (6th Cir. 2006), for example, when comparing prosecutorial complaints with police reports, this court determined that complaints bore "substantially greater indicia of reliability than mere police reports, which are not filed in court, are not sworn to, and are developed for an investigatory purpose."[2] *Id.* at 780; *see also United States v. Bell*, 785 F.2d 640, 644 (8th Cir. 1986) ("While police reports may be demonstrably reliable evidence of the fact that an arrest was made, they are significantly less reliable evidence of whether the allegations of criminal conduct they contain are true.") (citing *United States v. Pattman*, 535 F.2d 1062 (8th Cir. 1976)). Law-enforcement officers may be "charged with the

---

[2] That our assessment of police reports' reliability appeared in a discussion of whether certain documents met the *Shepard* standard makes it no less persuasive here.

responsibility of accurately transmitting statements," R. 176 (Resent'g Hr'g Tr. at 22) (Page ID #2488), but the grave consequences of sentencing demand a justification less rosy-eyed than this one for trusting such reports.

*Second*, the hearsay statements in the police report in this case were not externally corroborated. "[C]orroborating evidence can provide [hearsay] statements with a sufficient indicia of reliability." *United States v. Al-Cholan*, 610 F.3d 945, 955 (6th Cir. 2010) (alterations in original) (quoting *United States v. Manis*, 344 F. App'x 160, 166 (6th Cir. 2009)). In *Al-Cholan*, for example, a witness's testimony that the defendant had admitted to wide-ranging illicit sexual activity was corroborated by audio tape recordings of the defendant admitting to certain acts. *Id.* Corroboration figured prominently in the two cases cited by the government as well. In *United States v. Paull*, 551 F.3d 516 (6th Cir. 2009), we upheld the district court's application of the pattern-of-activity enhancement based, in part, on corroborated allegations in a letter submitted by an alleged victim. Specifically, the district court had relied upon "testimony from the probation officer assigned to the case that recounted telephone interviews with [this victim] and several of his family members" in concluding that the allegations were credible. *Id.* at 521. And in *United States v. Miller*, 755 F. App'x 440 (6th Cir. 2018), we upheld a pattern-of-activity enhancement based on a victim's statements that had been corroborated in a videotaped statement by her brother. *Id.* at 443; *see id.* ("Our prior cases underscore the point that context and corroboration can serve as indicators of the reliability of a victim statement used to enhance a sentence for a pattern of sexual abuse."). In stark contrast here, there is no corroboration—zero—of what Jones's now-deceased sister supposedly told a police officer three decades ago.

*Third*, unlike the externally corroborated victim statements at issue in the cases mentioned, the police report in this case did not include a self-authored victim statement at all—it was written

in the third person by a police officer *who did not interview the victim. Cf. United States v. Pirosko*, 787 F.3d 358, 373 (6th Cir. 2015) (pattern-of-activity enhancement upheld based on corroborated, out-of-court letters submitted by the defendant's two victim-daughters); *United States v. Chapman-Sexton*, 758 F. App'x 437, 442 (6th Cir. 2018), *cert. denied*, 139 S. Ct. 2731 (2019); *United States v. Hammond*, 637 F. App'x 897, 903 (6th Cir. 2016) (pattern-of-activity enhancement upheld based, in part, on victim's own statements included in PSR in relation to prior conviction). Here, the officer who actually interviewed the victim was not the one to write the police report, *see* R. 168-3 (Police Rep. at 7–8) (Page ID #2426–27) (Officer Michael E. Gibbs's narrative regarding comments that were allegedly made by the victim to Officer Pamela Berg), and the district court did not hear any testimony from any of the officers on the scene, *cf. Manis*, 344 F. App'x at 166. Unlike the videotaped statements at issue in *Miller*, or the self-authored letters at issue in *Paull* or *Pirosko*, the police report in this case represents one officer's description of what another officer allegedly heard from an eight-year-old child.

*Fourth*, the fact that Jones ultimately pleaded guilty to some offense based on this conduct does not substantiate the statements in the police report indicating that Jones committed *multiple* instances of sexual abuse against his sister, a critical element of the pattern-of-activity enhancement. The record contains no evidence regarding the facts to which Jones pleaded, for instance whether he admitted to multiple instances of abuse; it confirms only that he was charged with attempted rape, *see* R. 168-2 (Indictment) (Page ID #2415), but pleaded guilty to gross sexual imposition in 1991, *see* R. 168-2 (Journal Entry) (Page ID #2419). As we already explained in granting Jones relief on his first appeal:

> [N]othing in the [presentence] report indicates that Jones's prior conviction involved multiple instances of abuse. Indeed, nothing in the charging documents establishes that Jones's guilty plea involved multiple instances of abuse, and there

> was not testimony at trial establishing whether the offense involved two or more instances of sexual abuse.

*United States v. Jones*, 747 F. App'x 348, 359 (6th Cir. 2018).[3]  It is true that the indictment and bill of particulars, which preceded Jones's guilty plea to a modified offense, stated that the "date of offense" occurred within a period of time rather than on one day, R. 168-2 (Indictment) (Page ID #2414); R. 168-2 (Bill of Particulars) (Page ID #2416), which could suggest that Jones committed multiple offenses within this time period.  But if anything, a discrepancy between the time periods identified in the police report and in the subsequent indictment makes it *less* clear whether Jones's conviction was based on a theory of multiple instances of abuse.  The police report, which was created on August 25, 1990, R. 168-3 (Police Rep. at 1) (Page ID #2426), indicates that the victim stated that the abuse "happened twice last year [1989] and twice this year [1990]." *Id.*  But the indictment states that the "date of offense" was "January 1, 1990 to August 23, 1990," R. 168-2 (Indictment) (Page ID #2414), seemingly omitting the conduct that allegedly occurred in 1989.  In any event, nothing in Jones's guilty plea for gross sexual imposition admitted to committing multiple instances of abuse, nor has the government adduced any other evidence from the prior conviction to show that the abuse occurred multiple times.

Thus, the sole piece of evidence in the record supporting the conclusion that Jones previously committed multiple instances of sexual abuse or exploitation of a minor is the police report.  And not just any police report, but one that is thirty years old, that lacks any external corroboration, that does not include an actual victim statement, that was not composed by the officer interviewing the victim, and that did not clearly lead to a conviction for serial abuse.  I am

---

[3] This passage hardly represents this court "suggest[ing] other grounds for the enhancement," as the government characterizes it.  Appellee Br. at 5.

unwilling to endorse the lengthening of an already lengthy, mandatory-minimum sentence based on such threadbare evidence.

For these reasons, as to the pattern-of-activity enhancement, I dissent.